# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2015

(Argued: December 11, 2015          Decided: June 13, 2016)

Docket No. 14-3343-cv(L) 14-3728-cv(con)

--------------------------------------------------------------X

GUTHRIE HEALTHCARE SYSTEM,

*Plaintiff-Appellant-Cross-Appellee*,

v.

CONTEXTMEDIA, INC., an Illinois Corporation, RISHI SHAH, an Individual,

*Defendants-Appellees-Cross-Appellants*,

DOES I through X,

*Defendants*.

--------------------------------------------------------------X

Before:          JACOBS, LEVAL, CALABRESI, *Circuit Judges*:

Plaintiff, a provider of healthcare services in New York and Pennsylvania, and Defendant, a provider of digital health-related content nationwide, both appeal from the judgment of the United States District Court for the Southern District of New York (Forrest, *J.*), which granted limited permanent injunctive relief on Plaintiff's claim of trademark infringement. The complaint alleged that Defendant's trademarks were confusingly similar to Plaintiff's trademark. The injunction, following a bench trial, prohibited Defendant from using its marks within Plaintiff's geographic service area, but placed no restriction on Defendant's use of its marks on the Internet or outside Plaintiff's service area. The Court of Appeals concludes that Defendant's trademarks are infringing, but that the current limitations placed on Defendant by the district court in the injunction were based on an incorrect standard and fail to give Plaintiff and the public adequate protection from likely confusion. The finding of liability and the grant of injunctive

relief are AFFIRMED. The scope of the injunction is expanded, and the case is REMANDED for further proceedings.

> ELLIOTT J. STEIN, Stevens & Lee, Lawrenceville, NJ, (Bradley L. Mitchell, Neil C. Schur, *on the brief*), for *Plaintiff-Appellant-Cross-Appellee*.
>
> EAMON P. JOYCE, Sidley Austin LLP, New York, NY, (Joshua J. Fougere, *on the brief*), for *Defendants-Appellees-Cross-Appellants*.

Leval, *Circuit Judge*:

Plaintiff and Defendant[1] each appeal from the judgment of the United States District Court for the Southern District of New York (Forrest, *J.*), which, following a bench trial, imposed on Defendant a limited injunction. Defendant contests the finding of liability, and Plaintiff contests the limited scope of the injunction. The complaint alleged trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114, unfair competition, and a number of related claims, on the basis that Defendant's trademark logo was confusingly similar to Plaintiff's trademark. The court ruled in Plaintiff's favor, finding that a likelihood of confusion resulted from Defendant's use of trademarks similar to Plaintiff's. The court accordingly granted permanent injunctive relief, prohibiting Defendant from using its marks

---

[1] Where not otherwise indicated, "Defendant" refers to CMI. Rishi Shah, who is CMI's President, and also a Director, was also named as a Defendant. The district court found Shah not to be individually liable, and Plaintiff has not challenged this finding. His liability is not at issue on this appeal.

within Plaintiff's geographic service area ("Guthrie Service Area") (covering the "Twin Tiers" region of Northern Pennsylvania and Southern New York), but held that Defendant may continue to use its marks everywhere outside the Guthrie Service Area, as well as without restriction in Internet transmissions, on Defendant's websites and on social media.

We agree with the district court's liability determination that there is a likelihood of confusion between Plaintiff's and Defendant's trademarks. We conclude, however, that, in restricting the scope of the injunction, the court misapplied the law, and failed to adequately protect the interests of Plaintiff and the public from likely confusion. We therefore affirm the judgment in part, vacate in part, expand the scope of the injunction, and remand for further consideration of the scope of the injunction.

## BACKGROUND

### I. Plaintiff

Plaintiff Guthrie Healthcare System is a Pennsylvania non-profit corporation composed of Guthrie Healthcare, the Guthrie Clinic, and the Guthrie Foundation. Operating primarily in the Twin Tiers region of New York and Pennsylvania, Plaintiff has 32 medical facilities, including three hospitals and 29 clinics, as well as a number of specialized healthcare facilities such as a cardiology center and a cancer center. Plaintiff also operates home healthcare services, hospice services,

and a durable medical equipment company. It has a multi-disciplinary medical group practice that includes more than 280 physicians and 130 mid-level providers (physician assistants and nurse practitioners) who practice in New York and Pennsylvania. It also operates a pharmacy, and several medical supply stores, which sell directly to the public.

Plaintiff recruits doctors and residents nationwide. It provides educational programs for its physicians, nurses, and medical technicians. Additionally, it operates the Guthrie School of Nursing, which recruits students nationwide. The Guthrie Foundation conducts medical research and fundraising beyond the Guthrie Service Area, and disseminates medical information over the Internet, as well as in symposia and seminars. It requires that such information meet evidence-based medicine guidelines.

Plaintiff refuses to endorse third-party products or services or to host advertisements, in order to accommodate research funders' sensitivities, preserve its eligibility for clinical trials, and avoid the fact or appearance of conflict of interest, bias, or partiality.

Plaintiff derives a substantial portion of its patient-care revenue from referrals from physicians and medical professionals. Around 20% of the approximately $300 million annually paid to Plaintiff for specialized medical care comes from referrals by other doctors and medical professionals who are not

affiliated with Plaintiff. Plaintiff focuses considerable marketing efforts on these referring doctors and medical professionals, inviting them to classes, seminars, and symposia, and assuring them that Guthrie will not seek to provide medical services to the referred patients beyond those for which they were referred.

## II. Defendant CMI

Defendant ContextMedia ("CMI"), founded in 2006, has offices in Chicago and New York City, and employs 42 people. Rishi Shah is CMI's president and one of its directors. Defendant serves approximately 2,600 physician practices, and operates in all 50 states.

Defendant's business is to deliver health-related content to physician practices. Defendant installs digital screens in waiting areas, examination rooms, and infusion rooms in physician practices which play short videos and clips about health and wellness to patients at those facilities. In the vast majority of instances, Defendant's revenue comes from advertising displayed with its content; a small number of physicians who subscribe to its service pay a fee in order to avoid advertisements. The advertisers whose ads appear together with Defendant's content, its "sponsors," are mostly large pharmaceutical companies; their ads are displayed in between the segments of educational health-related programming.

The material Defendant displays on its screens is primarily educational digital content related to health and wellness, such as short segments on nutrition

and exercise tips. Much of this material is created by organizations such as the American Heart Association, the American Dietetic Association, the Academy of Nutrition and Dietetics, the Juvenile Diabetes Research Foundation, Health Day TV, and D Life, among others, from which Defendant obtains licenses to broadcast their materials.

Medical offices that wish to display CMI's programming in their practices enroll as Defendant's "members." Defendant then installs flat panel display units, media players, and necessary hardware in their waiting rooms. Defendant recruits new members by placing cold calls to physician practices.

Defendant has two websites: www.contextmediahealth.com, which serves primarily members, and www.contextmediainc.com, which is directed primarily to potential sponsors, prospective employees, and media.

The CMI screen is divided into three sections. A sidebar on the left side of the screen displays CMI's marks. There is also a main content window, and a news ticker at the bottom of the screen. The main content window also occasionally displays the CMI marks.

**III. The Trademarks**

**a. Plaintiff's Trademark**

Plaintiff launched the Guthrie Trademark and a new brand identity in September 2001. The mark was developed by Monigle Associates, a consulting

firm that works in corporate branding and identity. Soon after, every aspect of

Plaintiff's business bore the Guthrie Trademark. Plaintiff applied to register the

Guthrie Trademark with the United States Patent and Trademark Office ("PTO") in

2006, and the mark became a Registered Trademark on January 22, 2008.

Plaintiff's mark is pictured below:



The Guthrie Trademark has two elements—a logo on the left and the

Guthrie name, which appears in bold, capital letters to the right of the logo. This

litigation concerns primarily the logo. The Guthrie logo consists of a shield

containing a stylized human figure composed of crescent moon segments, topped

by a detached oval head. The upper part of the body—outstretched arms and

torso—is represented by a single crescent moon shape with its two points curving

upward, each representing an arm, terminating at points at the outer edges of the

background shield. The portion of the body below that crescent is represented by

two partial vertical crescents, joined at the top where they meet the upper body

crescent and combine to represent the lower part of the torso, and separated at the

bottom, so that each represents a leg. The points of the crescents curve toward the

viewer's left, and each lower tip ends at the border of the background shield. The

center point between the tips of the figure's legs is substantially to the right of the vertical center line of the background shield, while the head is to the left of the vertical centerline of the shield, so that the figure tilts toward the viewer's left. The points of the crescent moons (depicting the arms and the legs of the figure) divide the shield into four segments. The human figure is white. The segments of the shield outside the outline of the human figure are colored – two segments are dark blue, one is yellow, and one is orange. There is a small, rectangular cutaway at the top right corner of the shield. The word "Guthrie" is always presented in large, bold, capital letters to the right of the logo.

The Guthrie Trademark is prominently featured on both the primary Guthrie website (www.guthrie.org) and the website focused on personnel recruitment and business development (www.ichoseguthrie.org). The Trademark appears on Guthrie facilities, personnel badges, business cards, stationery, brochures, reports, publications, billboards, buses, and in print and television advertisements.

Beginning in 2001, Plaintiff ran television advertising that prominently displayed the Guthrie Trademark in New York and Pennsylvania. Plaintiff has also partnered with television stations to produce health-related features that have been broadcast to wide audiences, also featuring the Guthrie Trademark. From July 1, 2008 to June 30, 2013, Plaintiff spent $7.25 million promoting the Guthrie Mark and brand.

Starting in 2010, Plaintiff began a new program called digital signage, designed to "push" health-related content out to video screens at Guthrie facilities. Only two such screens are now in place, but according to Joseph Scopelliti, the President and CEO of Guthrie, "many more" are planned. The project was included in the 2013 and 2014 Fiscal Year budgets. However, the two screens that are in place have been there since 2011 (or 2010), and no more have gone up. There has been no development or implementation of content for the screens.

### b. Defendant's Trademarks

In late 2007, Defendant hired Anthony Bonilla, a graphic designer, to develop a logo. Defendant began using Bonilla's designs as its logos in March 2008.

Defendant's eight marks at issue in this litigation contain the same graphic element, although the colors of the background elements differ. Defendant's Mark 1 is pictured below:



Like the Guthrie logo, Defendant's logo consists of a shield containing a stylized human figure composed of crescent moon segments, topped by a detached

oval head. The upper part of the body—outstretched arms and torso—is represented by a single crescent moon shape with its two points curving upward, each representing an arm, terminating at points at the outer edges of the background shield. The portion of the body below that crescent is represented by two partial vertical crescents, joined at the top where they meet the upper body crescent and combine to represent the lower part of the torso, and separated at the bottom so that each represents a leg. Both of the points of these crescents curve toward the viewer's left, and each lower tip ends at the border of the background shield. The center point between the tips of the figure's legs is to the right of the vertical center line of the background shield, while the head is to the left of the vertical centerline of the shield, so that the figure tilts toward the viewer's left. The points of the crescent moons (depicting the arms and the legs of the figure) divide the shield into four segments.

As with Plaintiff's logo, the human figure in Defendant's logo is always white, and the four background shield sections are colored. Defendant uses its logo with text in bold, usually capitalized letters, laid out to the right of the logo. It uses the logo in eight different marks, the differences lying primarily in the different text and in the varying colors of the background shield. Three of Defendant's marks have a color scheme similar to Guthrie's—"Mark 1" (the logo with the text "Diabetes Health Network"), "Mark 2," (the logo with the text "ContextMedia"),

and "Mark 8" (the logo with the text "ContextMedia Health")—all have a purple segment, two yellow/gold segments, and a dark blue segment. Other CMI marks at issue have background color schemes that differ from Guthrie's. Three of the CMI marks are in black and white. Defendant sometimes uses its name, "ContextMedia," alongside the logo. In other marks, the text alongside the logo describes the health-related subject matter of the particular videos being shown. Occasionally Defendant's graphic appears on its own without accompanying text.

The PTO originally refused to register three of Defendant's marks because of likelihood of confusion with Plaintiff's mark. Defendant responded to the PTO and made many of the same arguments it made in this case. The PTO ultimately approved the marks for registration, and registered Defendant's first seven marks between 2009 and 2013.

On August 16, 2013, ten months after this litigation commenced, Defendant filed an Intent to Use Trademark Application to register another mark ("CMI Mark 8").

Defendant has rebranded itself as ContextMedia Health, and intends to use Mark 8 as its primary mark going forward. The condition-specific marks continue to be used in some communications with sponsors.

**IV.    Events Triggering this Suit**

Plaintiff had never heard of Defendant prior to December 2011, when

Plaintiff received a holiday card from Defendant which displayed its Mark 1. Mary Ann Dougherty, Plaintiff's director of strategic planning and marketing, saw that the "[t]he graphic elements used in the [CMI] trademarks [were] very, very similar to that of the Guthrie trademark." On January 3, 2012, she contacted Defendant to advise it that it was "duplicating" Plaintiff's logo and requested an explanation. She followed up with a letter on February 1, 2012, "demanding" that Defendant cease all use of Plaintiff's image. She never received a reply from Defendant.

**V.     Proceedings Below**

Plaintiff filed this action on October 26, 2012. The amended complaint asserts eight counts of trademark infringement under 15 U.S.C. § 1114; a claim of unfair competition under 15 U.S.C. § 1125(a); a claim of false designation of origin under 15 U.S.C. § 1125(a); common-law unfair competition; a claim of trademark dilution under 15 U.S.C. § 1125(c); and unjust enrichment.

Defendants moved for summary judgment on all counts, and the district court granted it in part. The court found that there was no triable issue of material fact as to actual consumer confusion, bad faith, or willful deception for Marks 1-7; as a result, monetary relief was not available under the Lanham Act. The court also granted summary judgment to Defendants on the state-law unfair competition claim, which requires bad faith as an element. Plaintiff abandoned its claim for dilution prior to the grant of summary judgment. Before trial, the court granted

Defendant's motion for reconsideration and dismissed Plaintiff's unjust enrichment claim, and also severed the eighth count of federal trademark infringement, which involved Defendant's Mark 8, the mark that was registered after the suit began.

The district court held a bench trial on February 5, 2014 regarding the remaining claims—seven counts of federal trademark infringement, a claim of unfair competition under the Lanham Act, and a claim of false designation of origin under the Lanham Act.

The court found that there was a "likelihood of confusion" as between Plaintiff's and Defendant's trademarks in the Guthrie Service Area. However, the court ruled that there was no such likelihood of confusion outside of the Guthrie Service Area.[2]

The court enjoined Defendant from using its marks within the Guthrie Service Area, but expressly authorized Defendant to "continue to use its marks on its websites, in social media, and in other online content that is made available to the public at large through the Internet." The court also denied an injunction for local use by Defendant in two New York counties (Tompkins and Schuyler) where Plaintiff maintains patient treatment facilities.

---

[2] The court also found for Plaintiff on the unfair competition and false designation claims, on the grounds that the standards for those claims were the same as the standard for trademark infringement. The court found that Defendant Shah was not individually liable.

Plaintiff appeals from the limited scope of the injunction, and Defendant appeals from the finding of infringement.

### DISCUSSION

**A.    Trademark Infringement**

A claim of trademark infringement under the Lanham Act is analyzed under a two-prong test. *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993); *see also Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003). The first prong looks to whether the senior user's mark is entitled to protection; the second to whether the junior user's use of its mark is likely to cause consumers confusion as to the origin or sponsorship of the junior user's goods. *Id.*

As to the first prong, a certificate of registration with the PTO is "prima facie evidence that the mark is registered and valid (*i.e.*, protectable), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999).

The likelihood-of-confusion prong turns on whether ordinary consumers "are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of [the junior user's] mark." *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 161 (2d Cir. 2004), *superseded by statute on other grounds as recognized in Starbucks Corp. v.*

*Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 108 (2d Cir. 2009) (quoting *Cadbury Beverages v. Cott Corp.*, 73 F.3d 474, 477-78 (2d Cir. 1996)). We have held that satisfaction of the likelihood-of-confusion standard requires a "probability of confusion, not a mere possibility." *Id.* (quoting *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 121 (2d Cir. 2001)).

In addressing likelihood of confusion and the appropriate remedy, we generally examine the non-exclusive list[3] of eight factors suggested by Judge Friendly in his landmark opinion in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961): the strength of the senior user's mark; the similarity of the parties' marks; the proximity of the parties' areas of commerce; the likelihood that the senior user will bridge the gap separating their areas of activity; the existence of actual consumer confusion; whether the junior user acted in bad faith or was otherwise reprehensible in adopting the mark; the quality of the junior user's product; and the sophistication of the relevant consumer group. The pertinence of individual factors varies with the facts of the particular case. Courts should not treat any one factor as dispositive, nor apply a "mechanical process"

---

[3] In *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531 (2d Cir. 1964), decided three years later, Judge Friendly added three more factors, to be considered when they are pertinent to the facts. These were "the rather sterile nature of plaintiffs' three-year priority due to their exceedingly limited sales in this country, their long delay in asserting their claim, and the serious harm an injunction would cause the defendant as against the trifling benefit to the plaintiffs." *Id.* at 536. These do not appear pertinent to our appeal.

awarding judgment to "the party with the greatest number of factors weighing in its favor." *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000).

We generally review determinations as to individual *Polaroid* factors for clear error, at least to the extent they involve factual determinations, and treat the trial court's balancing of the factors as a question of law to be reviewed *de novo*. *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 105 (2d Cir. 2009). However, we have recognized that the assessment of some of the *Polaroid* factors may involve issues of law. This is particularly so for determinations as to whether the senior user's mark is sufficiently fanciful or arbitrary in relation to the senior user's area of commerce to be deemed a strong mark, or in contrast, merely identifies or describes the senior user's commerce so as to be unenforceable or weak, as explained by Judge Friendly in *Abercrombie and Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976). *See Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 216 (2d Cir. 2003) ("[T]here is a considerable component of law in the determination whether a mark has the degree of strength necessary to weigh in favor of the party claiming infringement.").

We review the scope of a district's court's injunction for abuse of discretion, which can be found if the district court "relied upon a clearly erroneous finding of fact or incorrectly applied the law." *Catanzano by Catanzano v. Wing*, 103 F.3d 223, 228 (2d Cir. 1996).

**B. Applying the *Polaroid Factors***

It is undisputed that Plaintiff's mark is registered and entitled to protection. The principal questions in dispute are whether Defendant's use of its marks is likely to cause confusion in the marketplace, and, if so, the appropriate scope of relief.

In this case, as is often true, the factors that have the greatest pertinence are the degree of similarity between the two marks, and the proximity of Defendant's area of commerce to Plaintiff's. The strength of Plaintiff's mark and the sophistication of the buyers also play significant roles. Because of their predominance in this case, we discuss these four factors first.

**a. Similarity of the Marks**

The logos employed in Plaintiff's and Defendant's marks are jaw-droppingly similar—nearly identical not only in conception but also, as described above, in the great majority of the fine details of execution. Plaintiff submitted an exhibit illustrating Defendant's logo as an overlay of Plaintiff's, which shows that, while Defendant's logo does not exactly coincide with Plaintiff's, as they would in a tracing, they are very nearly identical in most instances. The differences are small and lie primarily in minor, relatively insignificant details, rather than in the overall visual impression the marks create upon casual inspection. One who studies them side-by-side would observe the small differences. However, a person having some

familiarity with Plaintiff's mark, who then casually sees Defendant's, as consumers do, without meticulously comparing them side-by-side, would be highly likely to believe she is seeing the familiar logo. *See W.W.W. Pharmaceutical Co., Inc.*, 984 F.2d at 573 (pointing to the need to look to the "general impression created by the marks, keeping in mind all factors which the buying public will likely perceive and remember"). This degree of similarity, furthermore, is in the context of an unusual and distinctive design. The more unusual and distinctive the design of a trademark logo, the greater the likelihood that such an astonishing degree of similarity will evoke an assumption that the senior and junior user are affiliated.

We recognize that one must assess likelihood of confusion "by reference to the marks in their entirety and not merely focusing on similar elements in marks which, taken as a whole, are not confusingly similar." *Brennan's, Inc. v. Brennan's Restaurant, LLC*, 360 F.3d 125, 133 (2d Cir. 2004). That does not alter our conclusion. As noted above, the text in Defendant's marks is laid out in a manner visually very similar to Plaintiff's mark. While Plaintiff's mark always sets forth Plaintiff's name, "Guthrie," and Defendant's use of the logo is often accompanied by references to various medical concerns such as "heart health," "dermatology," or "cardiology," there is no reason why these differences would suggest unrelatedness, especially as Plaintiff's medical practice concerns itself with the

very issues identified in the text of most of Defendant's marks.

Nor is likelihood of confusion dispelled by the fact that Defendant often uses its name, ContextMedia, alongside the logo. Given the importance of the distinctive logo in both cases to the overall design, coupled with the similarity between the two companies' logos, the appearance of Defendant's company name alongside what appears to be Plaintiff's logo would be likely to suggest to one familiar with the Guthrie trademark at least a mutually consenting or affiliated business relationship between ContextMedia and Guthrie.

In short, given the degree of similarity between Plaintiff's and Defendant's marks, together with the distinctiveness of the logos and the proximity of Plaintiff's and Defendant's areas of commerce, which we discuss below, it would be surprising if ordinary viewers familiar with Plaintiff's mark did not draw the mistaken inference, on seeing Defendant's mark and message, that the message they were seeing came from Plaintiff or its affiliate. Confusion resulting from the similarity is not only likely, it is highly probable; indeed in our view it is virtually unavoidable.

The district court found a "high degree of similarity" between Plaintiff's and Defendant's marks. Defendant contests that finding, arguing that the constant presence of the word "Guthrie" alongside Plaintiff's mark makes the two easily distinguishable. For reasons explained above, we reject Defendant's argument and

agree completely with the district court that this factor powerfully favors the Plaintiff.

### b. Proximity of Areas of Commerce

The proximity factor can apply to both the subject matter of the commerce in which the two parties engage and the geographic areas in which they operate. Its pertinence depends on the logical proposition that the public is less likely to draw an inference of relatedness from similar marks when the marks' users are in dissimilar areas of commerce, or, depending on circumstances, are involved in localized commerce in geographic areas widely distant from one another. A consumer who is familiar with the trademark of her oft-frequented coffee shop, who then observes that a designer/distributer of antivirus computer software does business under a trademark logo that is very similar to the coffee shop's trademark, is unlikely to believe that the two enterprises are related. On the other hand, if the patron of a Grand Concourse coffee shop sees a second coffee shop in a nearby neighborhood using what appears to be the same trademark, she is far more likely to believe that the two coffee shops are affiliated than if the second coffee shop is in San Antonio, Texas. The more likely it appears that an enterprise in one party's area of commerce might also engage in the other party's area of commerce, the greater the likelihood that the public will infer an affiliation from the similarity of the marks.

Plaintiff and Defendant operate in closely related fields. Plaintiff provides healthcare services. It operates numerous hospitals, clinics, and other healthcare facilities in a service area spanning two states. Defendant distributes health- and healthcare-related content on screens it places in doctor's offices. Over the Internet, Defendant recruits doctors in whose offices it would install its display screens, as well as sponsors (primarily pharmaceutical companies) and prospective employees, and it communicates with the media. In all of these communications, Defendant uses its marks that are so extraordinarily similar to Plaintiff's.

Given the clear subject-matter relationship of Defendant's communications to Plaintiff's commerce, there is every reason to believe that persons familiar with Plaintiff's trademark, who view Defendant's trademark, are likely to assume that Defendant and Plaintiff are related entities. Defendant's various trademarks, alongside its Guthrie-like logo, reference, for example, a "rheumatoid health network," a "heart health network," "a cardiology health network," a "dermatology health network," and a "skin care health network."  Plaintiff's hospitals, clinics and other healthcare facilities, no doubt, also concern themselves with these same medical concerns. If a user familiar with Plaintiff's mark knows that Plaintiff operates clinics and hospitals, and then sees Defendant's "Diabetes Health Network" logo, she is likely to assume that she is reading about *Plaintiff's* diabetes health network. At the same time, persons familiar with Defendant's transmissions

21

who then encounter Plaintiff's logo also have every reason to assume relatedness.

Proximity in a geographic sense also supports a likelihood of confusion. In the first place, Defendant's communications reach into the Guthrie Service Area. Defendant places screens in doctor's offices in the areas of New York and Pennsylvania where Plaintiff's care facilities are located; its Internet communications reach medical professionals operating in Plaintiff's area of operations; furthermore, its communications seeking sponsorship from pharmaceutical companies that operate nationwide are affecting business entities that operate in Plaintiff's area of commerce. Those who see Defendant's trademark-identified communications in Plaintiff's geographic area have every reason to believe they are affiliated with Plaintiff. The fact that Defendant's communications focus on such subjects as cardiology, rheumatology, diabetes, and dermatology, increases the likelihood that persons familiar with Plaintiff's health care network would infer affiliation from the similarity of the marks.

Furthermore, Plaintiff's activities are not confined to the Guthrie Service Area where most of its care facilities are located. Plaintiff recruits doctors, nurses, and other personnel throughout the country; it receives referrals from doctors who may be anywhere in the United States; and it distributes medical content through the Internet. While the number of instances of confusion occurring outside the Guthrie Service Area is likely to be smaller than within, reasonable persons outside

that area will encounter the two marks in connection with medicine-related commerce and will predictably mistakenly assume a relationship.

The district court found that the proximity factor favored Plaintiff as to Defendant's activity within Plaintiff's area of commerce. Defendant contests this finding. In our view there can be little doubt the district court was correct.

### c. Strength of Plaintiff's Mark

The *Polaroid* factor that focuses on the "strength" of the senior user's mark is significant for two separate reasons, one having to do with the likelihood of confusion in the marketplace, the other with broad public policy concerns underlying the law of trademark. The term "strength" refers primarily to four categories of gradually increasing protection accorded to trademarks, as illuminated in Judge Friendly's opinion in *Abercrombie and Fitch Co*, 537 F.2d at 9-11.[4]

At the bottom of the ladder is the *generic* mark, which is "understood as referring[] to the genus of which the particular product is a species." *Id.*, at 9. A generic mark cannot become a valid trademark, possessing the right to exclude others from its use. *Id*. The reason for this is obvious. One purveyor's use in

---

[4] The "strength" of a mark can refer also to strength acquired in the marketplace, which is roughly the equivalent of fame. The theory is that a mark similar to a famous mark is more likely to cause confusion, or at least more likely to cause a more widespread confusion, than a mark similar to a relatively unknown one. The concept of acquired strength has no application in this case, as Guthrie does not claim that its mark is famous.

commerce of a trademark consisting of the word that identifies what is sold under that mark "cannot [reasonably] deprive competing manufacturers of the product of the right to call an article by its name." *Id. See also J. Kohnstam, Ltd. v. Louis Marx & Co.*, 280 F.2d 437, 440 (C.C.P.A. 1960).

On the next rung up the ladder of strength is *descriptive* marks. Under the common law, descriptive marks were treated identically with generic marks, and so were also unprotectable for the same reason. *Id*. However, no doubt out of concern for businesses that invested time and money in building a brand identity under descriptive marks, the Lanham Act introduced an exception to this disqualification for descriptive marks. If a descriptive mark had acquired a "secondary meaning," in that it had "become distinctive of the applicant's goods in commerce," the previously unregistrable mark became registrable and protectable. 15 U.S.C. § 1052(f). Descriptive marks, being at the bottom of the ladder of enforceable marks, command weak protection.

The next rung up the ladder is for *suggestive* marks—those that communicate something about the product to which they relate, but by suggestion rather than description. These are accorded somewhat stronger protection. Finally, the strongest protection goes to marks that are *arbitrary* or *fanciful*—marks that have no logical relationship to the product or service for which they were used. *Abercrombie & Fitch Co.*, 537 F.2d at 10-11.

24

The first pertinence of the strength of a mark has to do with likelihood of public confusion. The more unusual and distinctive a particular mark, the more likely the consumer will assume, upon seeing it essentially replicated, that the newly observed user is the same as, or affiliated with, the originally observed user.

Considered in terms of inherent strength, different aspects of Plaintiff's mark pull in different directions. Defendant emphasizes that Plaintiff's mark shows a human figure in an energetic, athletic pose that is strongly suggestive of good health, which is the subject matter of Plaintiff's commerce.[5] The argument is not without force. If Plaintiff were seeking the exclusive right among entities operating in the area of health concerns to use a logo representing a human being in an energetic, athletic or dancelike pose, its claim would be weak.

However, while the subject matter of Plaintiff's logo somewhat weakens its claim, the manner of execution of the logo tends to strengthen it. This is not a conventional, ordinary representation of the human figure. The design is executed with considerable fanciful and arbitrary features—in particular the abstracted rendition of the human figure through joined crescent moon shapes and a separated oval. These abstract, geometric design features render Plaintiff's logo considerably more distinctive.

---

[5] Plaintiff's own testimony reveals that the logo was intended to be suggestive—to portray that Plaintiff was putting the patient at the center of all things that it did. The shield was meant to suggest heritage, strength, and stability.

Defendant also contends that the manner in which Plaintiff's logo imposes geometric, abstract shapes on the human body is commonplace and lacks originality. Defendant sought to illustrate the point by showing similar designs that are used in commerce. While it is true that the reduction of the human figure into abstract shapes is not unusual, none of the examples offered by Defendant looks significantly like Plaintiff's distinctive logo.

While Plaintiff's mark, given its health-related subject, may not belong in the highest category of inherent mark strength, nor does it belong in the weakest. Its design features are sufficiently fanciful, arbitrary, and distinctive to render it a reasonably strong mark. Furthermore, the distinctiveness of Plaintiff's design strongly supports Plaintiff on the issue of ultimate concern to our inquiry–the likelihood that Defendant's use of so similar a mark will cause confusion in the marketplace.

We do not imply that Plaintiff would necessarily prevail if it sought the exclusive right in the health field to employ a logo that represents the human body in terms of a smoothly oval head combined with crescent shapes. Nor do we imply that Defendant must be compelled to abandon completely its depiction of the human body in oval and crescent shapes. These are not the issues we confront. The issue is whether Defendant infringes Plaintiff's trademark rights by using marks that are nearly identical to Plaintiff's.

26

The ascending ladder of mark strength, which depends on the extent to which a mark does *not* claim exclusive entitlement over terms that serve in ordinary language to identify or describe the covered areas of commerce, also reflects the public policy underlying the trademark law. When applied to arbitrary and fanciful trademarks that do not seek to monopolize ordinary descriptive language, the trademark law powerfully serves the interests of sellers, buyers, and the general public alike. A seller can capitalize on a well-earned reputation for selling a product of dependable high quality, and consumers can distinguish one seller's mark as a reliable indicator of quality from the mark of a seller whose performance has been disappointing. One seller's monopolization of a particular term does not deprive competitors of anything of value because the number of arbitrary or fanciful marks available for use is infinite, and one merchant's exclusive reservation of the mark does not deprive others of the opportunity to use terms that apply adjectivally to their particular commerce. No one acquires a monopoly over the use of terms that ought to be generally available in the market of an area of commerce, as is the case to the extent one merchant acquires the exclusive right to the use of descriptive, or even suggestive, language. Thus, when sellers use arbitrary or fanciful marks, the trademark law produces a win-win formula, which benefits all participants in the marketplace and also serves public policy, by enabling the public to know what purveyor is the source of products and

services offered on the marketplace. We conclude that Plaintiff's design has a sufficient degree of originality and distinctiveness to increase the likelihood of confusion and to avoid the circumstance in which grant of relief would unfairly reserve to one party adjectival terms to which all entities working in the area of commerce ought to have access.

### d.     Buyer Sophistication

The sophistication factor can have a significant bearing on likelihood of confusion. Where the persons with whom a senior user hopes to do business or with whom a senior user hopes to maintain a favorable reputation have a high degree of familiarity and sophistication concerning the market in which the senior user operates, it may be obvious to them, notwithstanding similarity of trademarks, that a junior user's activities have no relationship to those of the senior user. Conversely, to the extent that a senior user's potential customers, and other entities with which it hopes to maintain its reputation, do not have a sophisticated knowledge of the overall market, the likelihood is higher that similarity of trademarks may lead them to believe that a junior user's activities are affiliated with those of the senior user.

The buyer sophistication factor favors Plaintiff. As the district court recognized, even to the extent that Plaintiff's prospective customers exercise care in choosing a physician or hospital, there is no reason to believe they would know

that Defendant's communications, identified by a trademark looking deceptively like Plaintiff's, are in fact not Plaintiff's communications.

Defendant argues that this circumstance cannot occur because it has no screens in Plaintiff's facilities. Nonetheless, the fact that patients attend Plaintiff's facilities does not mean that they are not also treated in other medical offices where Defendant has placed screens. Potential patients of Plaintiff might see Defendant's screens with Defendant's marks in the offices where they currently receive treatment, and might assume on subsequently observing Plaintiff's mark that the communications they saw in those other offices came from Plaintiff.

Furthermore, the concern for confusion does not relate exclusively to Plaintiff's patients and potential patients. It concerns also doctors and nurses whom Plaintiff might wish to recruit into its network. Although such persons obviously have far greater knowledge and sophistication with respect to the practice of medicine than ordinary patients, there is no reason to believe that doctors and nurses who are not affiliated with Plaintiff know whether Plaintiff does or does not sponsor the content broadcast by Defendant. A doctor's opinion of Defendant's content might well influence the doctor's subsequent decision whether to associate her practice with Plaintiff's network, or whether to refer a patient. In other words, even if some observers of Plaintiff's and Defendant's trademarks might have sufficient familiarity with Plaintiff's or Defendant's businesses to know that,

notwithstanding the extraordinary similarity of their marks, there is no affiliation between them, a substantial segment of the persons whose favorable opinion is important to Plaintiff's success in business would have no reason to know that Defendant's communications are not affiliated with Plaintiff. This factor favors Plaintiff.

### e.    The Remaining Factors

On our particular facts, the remaining *Polaroid* factors have little bearing on the ultimate conclusion. We address each briefly.

### i.    Relative Quality

Differences in relative quality as between a senior user's and a junior user's merchandise primarily affects the potential for harm to the senior user's reputation, and can also affect the likelihood of consumer confusion. In this case, there is no claim, or showing, that relative quality should play any role in the court's determination.[6]

### ii.    Defendant's Intent

---

[6] While Plaintiff does not contend it will be harmed by poor quality in Defendant's product, it does reasonably assert that it will suffer harm with some of its constituents because Defendant's transmissions exhibit advertising by pharmaceutical companies. Plaintiff refuses to host advertising to avoid an appearance of partiality that might harm its eligibility to conduct clinical trials and receive funding for research. The argument is a reasonable one. It suggests that, at least in some circumstances, the *Polaroid* factor that ordinarily focuses on the quality of the junior user's commerce can also be affected by the nature or subject matter of the junior user's commerce when those are objectionable for whatever reason to the senior user's customers.

The most likely relevance of bad faith on the part of a junior user in choosing a mark similar to a senior user's bears primarily on the appropriate remedy for the junior user's infringement. Bad faith is not an essential element of a claim of infringement.

In any event, Plaintiff does not contend that Defendant adopted its marks with the hope of deceiving consumers about a relationship between Defendant and Plaintiff. And while reasonable minds might question the likelihood that the person who designed Defendant's marks could have produced a design so nearly identical to Plaintiff's without ever having seen it, the designer of Defendant's logo denied having seen it. Plaintiff has not pressed for a contrary conclusion. The district court found no bad faith, and it appears the issue is of no pertinence to this appeal.

### iii.     Actual Confusion

Instances of actual confusion resulting from a junior user's use of a mark similar to a senior user's can be powerful evidence supporting a likelihood of confusion. At the same time, if the two marks have been in use over a substantial period of time without ever producing instances of confusion, this fact can support a junior user's contention that confusion is not likely. *See McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1136 (2d Cir. 1979), *superseded by rule on other grounds as recognized by Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033 (2d Cir. 1992). However, the absence of evidence of actual confusion

does not necessarily prove anything, especially when there has been neither long nor significant experience of the two trademarks operating side-by-side in the same market. Unless evidence of actual confusion falls into the senior user's lap, as where it receives inquiries from the public about the junior user's products, absence of evidence of actual confusion does not necessarily support the proposition that there has been no confusion. Evidence of actual confusion can be both expensive and difficult to obtain. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.* 799 F.2d 867, 875 (2d Cir. 1986). If a patient sitting in a doctor's waiting room, who had some familiarity derived from prior experience with Plaintiff's trademark, saw Defendant's content on a waiting-room screen and believed, based on the trademark's similarity to Plaintiff's mark, that the message was produced by Plaintiff, it would be very difficult for Plaintiff to obtain evidence of that fact.

Accordingly, it is "black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Id. See also Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 397 (2d Cir. 1995) (stating that the issue of actual confusion is "not dispositive of the question of likelihood of confusion").

There is no evidence in this record of actual consumer confusion. Plaintiff presented no consumer surveys, and acknowledged that it was not aware of any

actual consumer confusion. While Plaintiff's case would of course be even stronger if it had evidence of actual consumer confusion, the absence of such evidence does not particularly weaken Plaintiff's showing of likelihood of confusion given how persuasively the factors discussed above support that probability. Accordingly, this factor has no significant bearing on this appeal.

### iv. Bridging the Gap

The factor that focuses on the "likelihood that the prior owner will bridge the gap," *Polaroid Corp.*, 287 F.2d at 495, becomes pertinent primarily when the junior user makes a credible case that there is little or no likelihood of consumer confusion because the senior user operates in a different field of enterprise or a different geographic area. In such circumstances, the senior user can undercut the force of the junior user's argument by showing a likelihood that it will expand geographically or into other areas of commerce so that the likelihood of confusion will increase. The senior user of the mark is the entitled user and should not be confined within the present scope of its commerce by the risk of confusion that will result from a reasonably plausible expansion of its business. *See Savin Corp. v. Savin Group*, 391 F.3d 439, 459-60 (2d Cir. 2004) (stating that this factor "is designed to protect the senior user's interest in being able to enter a related field at some future time").

In our case, because Defendant is already using its marks in both the subject

matter area and the geographic area of Plaintiff's commerce, there is no gap.

Defendant's use of its marks already causes an actionable likelihood of confusion.

Resolution of the question of likelihood of confusion does not depend on whether

Plaintiff will expand its commerce.[7] Upon the facts of this case, the likelihood of

Plaintiff's expansion has no real pertinence to whether Defendant's continued,

unchanged use of its marks is likely to cause unacceptable confusion. In other

words, it has no bearing on the question whether Plaintiff has adequately proven

Defendant's liability.[8]

### f. Overall Likelihood of Confusion

On the question whether Plaintiff adequately proved Defendant's liability,

based primarily on likelihood of confusion in the marketplace resulting from

Defendant's use of marks confusingly similar to Plaintiff's, we conclude that this

was amply shown and therefore affirm the district court's finding of liability.

Although the ultimate inquiry on the question of liability is often referred to as a

"balancing test," *see, e.g.*, *Starbucks Corp.*, 588 F.3d at 115, in this case we find no

---

[7] In any event, even to the extent that Plaintiff and Defendant did operate in different parts of the healthcare field, Plaintiff presented evidence of intent to expand into Defendant's specific market with its digital signage program.

[8] Although the likelihood of Plaintiff's future expansion has no bearing on whether it has adequately proven Defendant's liability based on Defendant's present use of its similar marks (because Plaintiff has demonstrated likelihood of confusion regardless of whether Plaintiff expands its commerce), we recognize that the likelihood of Plaintiff's expansion might have a bearing on the terms of an injunction imposed on Defendant. This issue is discussed in the next section of this opinion.

need to balance. The extraordinary similarity of the marks, the proximity of commerce both as to subject matter and geographic area, the strength of Plaintiff's mark, and the absence among consumers of sufficient sophistication to protect against confusion, all work together to make a powerful showing of likelihood of confusion. The other factors, which are sometimes pertinent to a determination of liability, have little or no pertinence on the particular facts of this case.[9]

On the other hand, the district court appeared to conclude that, because under present circumstances it found no probability of confusion resulting from Defendant's use of its marks outside Guthrie's Service Area, Plaintiff was not entitled to an injunction outside that area. This was a misunderstanding of the law. We discuss this issue further in the next section dealing with the scope of the injunction.

### C. Scope of the Injunction

Plaintiff contends the district court misapplied the governing law in fashioning a narrowly limited injunction, which failed to give Plaintiff adequate protection from Defendant's use of virtually identical marks. We agree.

It appears the district court reasoned that, because a senior user must show not only a possibility but a probability of confusion in order to win entitlement to

---

[9] The district court concluded that three factors—actual confusion, bridging the gap, and bad faith–favored Defendant. We agree to the limited extent that consideration of these factors did not strengthen Plaintiff's case.

an injunction, a senior user that shows such a probability of confusion in one geographic area and thus wins an injunction, is not entitled to have the injunction apply to additional areas, unless the senior user proves a probability of confusion in those additional areas as well. The court credited Plaintiff with having proven a probability of confusion in the Guthrie Service Area and accordingly awarded an injunction covering that area. But as for additional areas, the court found that Plaintiff had failed to satisfy the probability standard, and accordingly concluded it was not entitled to an injunction going beyond the Service Area.

This misinterpreted the law. It is correct that a senior user must prove a probability of confusion in order to win an injunction. But it does not follow that the injunction may extend only into areas for which the senior user has shown probability of confusion. It is not as if the senior user must prove a new claim of infringement for each geographic area in which it seeks injunctive relief. Once the senior user has proven entitlement to an injunction, the scope of the injunction should be governed by a variety of equitable factors—the principal concern ordinarily being providing the injured senior user with reasonable protection from the junior user's infringement. Of course, if the junior user demonstrates that in a particular geographic area there is no likelihood of confusion, ordinarily no useful purpose would be served by extending the injunction into that area, potentially inflicting great harm on the junior user without meaningful justification. *See Dawn*

*Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 364-65 (2d Cir. 1959) (upholding the district court's finding that, "in view of the plaintiff's inactivity for about thirty years in exploiting its trademarks in defendant's trading area at the retail level . . . there was no reasonable expectation that plaintiff would extend its retail operations into defendant's trading area").

Plaintiff complains particularly that the court's order (i) expressly allows Defendant to use what is essentially Plaintiff's logo on the Internet, notwithstanding that these uses unquestionably enter the Guthrie Service Area and will predictably cause confusion there, (ii) does not even prohibit Defendant from making local use of the infringing marks in two counties where Plaintiff operates facilities, and (iii) leaves Defendant free to use what is essentially Plaintiff's mark throughout the nation, beyond the counties where Plaintiff operates facilities, despite Plaintiff's showing of some likelihood of confusion beyond its Service Area.

All three of these arguments have merit. The first problem with the injunction is that it allows Defendant to make substantial use of the marks *within* the Guthrie Service Area. The court's ruling leaves Defendant free to use the marks on the Internet, notwithstanding that Defendant's webpages are accessible in Plaintiff's Service Area, and are likely to cause confusion there. Secondly, the district court also expressly allowed Defendant unrestricted

use of the marks in two counties (Tompkins and Schuyler) where Plaintiff maintained healthcare facilities, explaining that Plaintiff had "presented no evidence regarding the setup of these locations, in particular the patient waiting-room experience there … [and] [a]ccordingly … ha[d] not proven that any patient exposure to [Defendant's] content in waiting rooms in those counties would occur or would be similar to exposure in the 11 counties discussed at trial." The court's explanation for excluding these counties where Plaintiff maintains patient care facilities from the scope of the injunction seems to us unpersuasive.

Regarding Plaintiff's argument that the district court erred by allowing Defendant to continue to use its marks throughout the nation, Defendant responds by citing and misreading circuit precedent, in particular *Dawn Donut Co.*, 267 F.2d 358; *Starter Corp. v. Converse, Inc.*, 170 F. 3d 286 (2d Cir. 1999); and *Brennan's, Inc. v. Brennan's Restaurant, LLC*, 360 F.3d 125 (2d Cir. 2004). We agree with Plaintiff that the district court did not correctly apply the law and the equities in so limiting the injunction.

The district court relied primarily on the proposition asserted in *Starter Corp.* that a permanent injunction must be "narrowly tailored to fit specific legal violations" and that a court "should not impose unnecessary burdens on lawful activity." *Starter Corp.*, 170 F.3d at 299. This proposition is without question a correct statement of the law. However, it does not follow from it that a senior user

who has proven entitlement to an injunction affecting one geographic area by reason of the junior user's infringement must show the same high degree of probability of harm in every further area into which the injunction might extend, thus allowing the infringer free use of the infringing mark in all areas as to which the senior user has not shown a substantial probability of confusion. "[A] party who has once infringed a trademark may be required to suffer a position less advantageous than that of an innocent party . . . and a court can frame an injunction which will keep a proven infringer safely away from the perimeter of future infringement." *Patsy's Brand, Inc.*, 317 F.3d at 220 (internal citations and quotation marks omitted).

Defendant's reliance on *Dawn Donuts* is misplaced for several reasons. In that case, the absence of likelihood of confusion was *proven by the defendant* by showing that in 30 years of operation the plaintiff had never sought to use its mark in the defendant's area. The court noted that there was "ample evidence" supporting the absence of likelihood of confusion. *Dawn Donuts Co.*, 267 F.2d at 365. Furthermore, the court ruled that, if the plaintiff later made a showing of intent to use the mark in the defendant's market area, then the plaintiff "may later . . . be entitled to enjoin defendant's use of the mark." *Id.* Finally, *Dawn Donuts*, did not present the problem, like this case, of a plaintiff who has shown entitlement to an injunction in one geographic area and seeks to have the injunction extend

beyond as well. It therefore has no pertinence to the question at issue here.

*Brennan's* is also inapposite. In *Brennan's,* the court had found no showing of likelihood of confusion, and therefore no infringement. *Brennan's, Inc.*, 360 F.3d at 130, 134. It did not involve our question of the propriety of extending the scope of an injunction against a proven infringer beyond the geographic area where the likelihood of confusion is most intense.

Nor does *Starter Corp.,* support the district court's approach. While that case did involve the scope of the injunction awarded against a proven infringer, the reasons that justified the Court of Appeals in concluding that the injunction was too broad were very different. At the trial, the plaintiff's own witnesses had testified that the particular use by the defendant that was ultimately found to have been wrongly enjoined "was not at issue in [the] litigation and its attorneys so agreed." *Starter Corp.*, 170 F.3d at 300. Furthermore, the plaintiff had "virtually conceded that there would be no 'likelihood that purchasers of the product may be misled in the future.'" *Id.* (citation omitted).

In our case, in addition to proving that Defendant was infringing Plaintiff's mark, subjecting Plaintiff to a high probability of confusion in its main Service Area, Plaintiff has also shown that its activities and commercial relationships extended beyond that area, rendering it vulnerable to plausibly foreseeable

confusions and harms resulting from Defendant's use of the marks outside the Guthrie Service Area.

Plaintiff recruits doctors, residents, and nursing students nationwide; it disseminates medical information over the Internet; it receives referrals from other physicians and medical professionals, who may be anywhere in the country; and, with respect to its medical research and clinical trials, it solicits funding beyond its Service Area. In all of these activities, Plaintiff is exposed to the risk of confusion and harm resulting from Defendant's use of the marks outside that area. For example, in order to avoid the fact or appearance of conflict of interest, which might harm its reputation with funders of its medical research or cause it to be disqualified by U.S. Government agencies from clinical trials, Plaintiff takes care not to endorse products or host advertisements for third-party products or services. If Defendant's transmissions were to display advertising of pharmaceutical products or endorsements, and this were observed outside the Guthrie Service Area by Plaintiff's potential funders or by government agencies, who would predictably believe that what they saw came from Plaintiff, Plaintiff could suffer serious harm to its reputation, impacting its receipt of funding grants or its eligibility to conduct clinical trials. Furthermore, potential doctors and nurses around the country whom Plaintiff seeks to recruit might well be affected in their employment decisions by what they see on Defendant's screens or transmissions. The same might apply to

referrals of patients.

The district court's limitation on the geographic scope of the injunction also could cause Plaintiff substantial harm in another manner. Because the district court authorized Defendant to use what is in effect Plaintiff's mark as Defendant's mark outside the Service Area, Plaintiff, which now operates over 100 facilities in the Twin Tiers region, cannot expand beyond those borders without subjecting itself to a high risk of consumer confusion. This cloud affecting Plaintiff's mark beyond the counties where it presently maintains facilities might substantially impair its opportunity for growth and its eligibility as a prospective merger partner with entities operating outside its Service Area, diminishing its value as a commercial entity. *See Savin Corp.*, 391 F.3d at 459-60 (discussing the need to "protect the senior user's interest in being able to enter a related field at some future time").

No doubt, an injured senior user must show evidence of plausibly foreseeable confusion beyond its main area of injury before the trial court is required even to consider extending the injunction into such additional areas. In the evidence summarized above Plaintiff easily satisfied that requirement.

In so ruling, we do not imply that senior users who prove likely confusion and infringement by a junior user's use of their marks in their area of operation are *necessarily* entitled to injunctions extending beyond their geographic area of operation. Every case turns on its particular facts, and in many instances it will be

clear, for a variety of reasons, that an injunction of narrow geographic scope will grant the senior user completely adequate protection, and that an injunction going further would be not only unnecessary but unjust. Trademark cases vary enormously depending on highly specific factual differences, so that it is perilous to generalize in asserting rules. Plaintiff in our case made a showing of plausibly foreseeable confusion and harm resulting from Defendant's use of its marks beyond the area where confusion was probable. Even assuming it failed to show *probability* of confusion beyond its Service Area, that is not the governing standard in such circumstances. Plaintiff was entitled to have the district court consider extending the injunction beyond the area where confusion was probable upon proper consideration of all the equities.[10]

We recognize further that the competing equities do not always favor a senior user that has shown infringement. Cases frequently arise in which imposition of a broad injunction on an innocent infringer, which had no realistic way of knowing that its mark was subject to a prior claim, would cause the junior

---

[10] Nor do we imply that a prevailing plaintiff operating within a narrow service area is necessarily entitled to an injunction barring the infringing defendant from using its mark on the Internet because of the availability of material on the Internet within the plaintiff's service area. The proper scope of the injunction depends on likelihood of confusion, which in turn depends on innumerable variable factors. The particular facts of this case lead us to conclude that Defendant's use of the logo on the Internet will cause sufficient likelihood of confusion to justify barring Defendant from Internet use. In other infringing circumstances, whether because of differences in the marks, geographic separation, differences between plaintiff's and defendant's commerce, or other reasons, a defendant's use of its mark on the Internet would cause little or no likelihood of confusion, and need not be enjoined.

user a catastrophic loss of goodwill acquired through investment of years of toil and large amounts of money. In such cases, notwithstanding that the legal right unquestionably belongs to the senior user, competing equities can complicate the issue of the breadth of injunctive relief. In our case, in contrast, a number of equitable considerations appear to favor Plaintiff.

Although Defendant did not act with bad faith in the sense of deliberately sowing confusion between its marks and Plaintiff's, Defendant could easily have avoided the problem that arose from its adoption of marks already reserved by another user. Precisely for the purpose of giving notice of its mark to the world, Plaintiff had registered its mark with the PTO. Had Defendant exercised the precaution of running a trademark search before launching its marks, it would have learned that they were unavailable and would surely have had the good sense not to proceed with a logo so nearly identical to one for which trademark rights were already established. Defendant did not conduct a trademark search until it sought to register its marks and was notified by the PTO on February 28, 2012, that the marks it sought to register were "striking[ly] similar" to Plaintiff's already registered mark. Accordingly, while Defendant is not a "bad faith" infringer, nor is it an entirely innocent infringer. The government had placed a convenient tool at its disposition, which it could have used to avoid this infringement, and it failed to utilize that tool.

Furthermore, this is not a case in which an injunction would have catastrophic effects on the infringer's business. In some cases, an innocently infringing junior user has invested many years of toil and large sums of money in the development of goodwill in its mark before learning of the prior reservation of rights. Defendant here had only recently begun using the logo. Nor is this a case in which the junior user is compelled to give up the name of its business. What is at stake is only the use of a decorative logo. No reason appears why Defendant cannot change its logo to one that is not confusingly similar to Plaintiff's without suffering major harm to its business.[11] Finally, Plaintiff is the injured party, and so far as we can see was without fault in the matter.

Finally, the equitable interests to be considered in fashioning an injunction are not only those of the parties to the litigation. An important beneficiary of the trademark system is the public. The public has a great interest in administration of the trademark law in a manner that protects against confusion. By perpetuating a highly confusing circumstance, the court's injunctive order harmed that public interest. The public interest would undoubtedly be better served by the elimination of this confusion.

---

[11] The district court might contemplate diminishing any harm to Defendant caused by a mandatory logo change by allowing the change to be made in stages, perhaps beginning with the addition of a reasonably prominent disclaimer of connection to Plaintiff.

For the reasons explained above, we affirm the district court's finding of liability to the extent it found that Defendant infringes Plaintiff's mark. However, to the extent the court ruled that Defendant has not infringed Plaintiff's mark by using its marks outside Plaintiff's main Service Area, its judgment is vacated. The injunction ordered by the district court is affirmed to the extent that it enjoined Defendant from use of its marks. The scope of the injunction is hereby expanded to include Tompkins and Schuyler counties. We vacate the district court's order to the extent it leaves Defendant free to use its marks outside Plaintiff's Service Area, and in online applications. We leave it to the district court to determine whether the injunction can be tailored to allow Defendant some limited use of its marks outside Plaintiff's Service Area (expanded to include Tompkins and Schuyler counties) and on the Internet, giving due weight to Plaintiff's interest in protection from the risk of confusion in the marketplace and to all other appropriate equitable considerations. The matter is remanded for further proceedings in accordance with this ruling.

**CONCLUSION**

The judgment of the district court is AFFIRMED in part, REVERSED in part, and VACATED in part, and the matter is REMANDED for further proceedings in accordance with this opinion. An appeal from the district court's amended judgment should be referred to this panel.