23-12-cv
*Jackpocket, Inc. v. Lottomatrix NY LLC*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

### SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 18ᵗʰ day of March, two thousand twenty-four.

Present:

> JOHN M. WALKER, JR.,
> WILLIAM J. NARDINI,
> STEVEN J. MENASHI,
> *Circuit Judges*.

———————————————————————

JACKPOCKET, INC.,

> *Plaintiff-Appellant*,

v.                                                            23-12-cv

LOTTOMATRIX NY LLC, LOTTOMATRIX CORPORATION, LOTTOMATRIX OPERATIONS LIMITED, AKA JACKPOT.COM, LOTTOMATRIX MALTA LIMITED, 99DYNAMICS LIMITED,

> *Defendants-Appellees*.*

———————————————————————

For Plaintiff-Appellant:           DOUGLAS A. RETTEW (Patrick J. Rodgers, Troy Viger, *on the brief*), Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Washington, DC

For Defendants-Appellees:           WILLIAM B. ADAMS (Todd Anten, Rachel E. Epstein,

---

* The Clerk of Court is respectfully directed to amend the caption as set forth above.

Dylan I. Scher, *on the brief*), Quinn Emanuel Urquhart & Sullivan LLP, New York, NY

Appeal from a judgment of the United States District Court for the Southern District of New York (Lewis J. Liman, *District Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Plaintiff-Appellant Jackpocket, Inc. ("Jackpocket") appeals from a judgment of the United States District Court for the Southern District of New York (Lewis J. Liman, *District Judge*), entered on December 29, 2022. Following a bench trial, the district court ruled in favor of Defendants-Appellees Lottomatrix NY LLC, Lottomatrix Corporation, Lottomatrix Operations Limited, Lottomatrix Malta Limited, and 99 Dynamics Limited (together, "Jackpot.com") with respect to all of Jackpocket's claims. Jackpocket, an incumbent in the U.S. lottery courier services market, filed a lawsuit against Jackpot.com, a planned entrant into that market, in July 2022. That lawsuit claimed, *inter alia*, that Jackpot.com's use of its mark constitutes federal trademark infringement, in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); trademark infringement, false designation or origin, and unfair competition, in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); and common law trademark infringement and unfair competition, in violation of New York common law and New York General Business Law § 360(o). The district court held a bench trial on the merits in November 2022, pursuant to Federal Rule of Civil Procedure 65, and returned a verdict for Jackpot.com on all counts. Jackpocket now appeals the district court's judgment as to its state and federal trademark infringement and unfair competition claims. We assume the parties' familiarity with the case.

"In reviewing the decision of a district court following a bench trial, we review findings of fact for clear error and conclusions of law *de novo*." *Hamilton Int'l Ltd. v. Vortic LLC*, 13 F.4th 264, 271 (2d Cir. 2021).[1] "[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.*

"To prevail on a trademark infringement claim under the Lanham Act, the plaintiff must show that: (1) plaintiff owns a valid protectable mark; and (2) defendant's use of a similar mark is likely to cause consumer confusion as to the origin or association of the goods or services." *Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 88 F.4th 125, 135–36 (2d Cir. 2023). "[I]n either a claim of trademark infringement under § 32 or a claim of unfair competition under § 43, a prima facie case is made out by showing the use of one's trademark by another in a way that is likely to confuse consumers as to the source of the product." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986); *see Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 129 (2d Cir. 2004). Similarly, "[u]nder New York law, proof of likelihood of confusion as to source is essential to prevail on either [a trademark infringement or unfair competition claim]." *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 624 (2d Cir. 1983).

Thus, the common inquiry governing all of Jackpocket's claims on appeal is whether it has established that Jackpot.com's use of its mark in U.S. commerce is likely to cause consumer confusion about the source of Jackpot.com's product offering.

"This Court applies the eight-factor test identified in *Polaroid* to assess the likelihood that an allegedly infringing product will create consumer confusion." *Vans*, 88 F.4th at 136.

> The eight factors are: (1) strength of the trademark; (2) similarity between the two marks; (3) proximity of the products and their competitiveness with one another;

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted.

(4) likelihood the prior owner may 'bridge the gap' in the markets for their products; (5) evidence of actual consumer confusion; (6) the defendant's good faith in adopting its imitative mark; (7) quality of the defendant's product compared with the plaintiff's product; and (8) sophistication of the buyers.

*Id.* (citing *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)). "[T]he mere possibility of confusion is not enough. . . . [A] plaintiff must prove a *probability* of confusion affecting numerous ordinary prudent purchasers." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020). "[A] trial court's findings as to each *Polaroid* factor are *typically* reviewed for clear error, with the court's weighing of those factors reviewed *de novo*." *Hamilton*, 13 F.4th at 271 (emphasis added). However, "insofar as the determination of whether one of the *Polaroid* factors favors one party or another involves a legal judgment—which it often does—we must review that determination *de novo*." *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 109 (2d Cir. 2023). Particularly, "determinations as to whether the senior user's mark is sufficiently fanciful or arbitrary in relation to the senior user's area of commerce to be deemed a strong mark, or in contrast, merely identifies or describes the senior user's commerce so as to be unenforceable or weak," "may involve issues of law" and thus are reviewed *de novo* to the extent that they do. *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 38 (2d Cir. 2016); *see RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 121 (2d Cir. 2022).

The district court concluded that, of the *Polaroid* factors, the strength of Jackpocket's trademark, the similarity between the two trademarks, evidence of actual consumer confusion, Jackpot.com's good faith in adopting its mark, and the sophistication of consumers favored Jackpot.com; the proximity of the products favored Jackpocket; and the likelihood of "bridging the gap" and the products' respective quality were neutral. The district court concluded that the factors balanced in Jackpot.com's favor and accordingly held that Jackpot.com's use of its mark was not likely to cause consumer confusion. Jackpocket challenges the district court's conclusion

4

only as to the strength of the mark, the similarity of the marks, and actual consumer confusion. Upon review of the record and the applicable law, we affirm the district court's judgment for substantially the same reasons as those set forth in its thorough and well-reasoned opinion.

## I.    Strength of the Mark

"The strength of a mark depends ultimately on its distinctiveness, or its origin-indicating quality, in the eyes of the purchasing public.  The strength of a trademark is assessed based on either or both of two components: (1) the degree to which it is inherently distinctive; and (2) the degree to which it has achieved public recognition in the marketplace, sometimes called acquired strength." *RiseandShine*, 41 F.4th at 120; *see Souza*, 68 F.4th at 111.  The strength-of-mark factor is "often the most important." *RiseandShine*, 41 F.4th at 119.

### A.  Inherent Strength

"This inquiry distinguishes between, on the one hand, inherently distinctive marks—marks that are arbitrary or fanciful in relation to the products (or services) on which they are used—and, on the other hand, marks that are generic, descriptive or suggestive as to those goods.  The former are the strong marks." *Virgin Ents. Ltd. v. Nawab*, 335 F.3d 141, 147 (2d Cir. 2003); *see also RiseandShine*, 41 F.4th at 120 ("[S]trong marks command a wider scope of protection than weak marks. . . .  In contrast, trademark law offers a much narrower scope of protection to marketers who seek to bar others from using words that describe or suggest the products or the virtues of their products.").  "To describe different degrees of inherent distinctiveness, the trademark law utilizes four categories.  In order of ascending strength, they are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *RiseandShine*, 41 F.4th at 120.  "When a mark so clearly evokes the claimed virtues of the product it references, that mark, although perhaps muscular as a marketing tool, is weak under the trademark law." *Id.* at 122.  That the mark is

5

suggestive does not end the inquiry: "[i]f the suggestion conveyed by a suggestive mark conjures up an essential or important aspect of the product, while the description conveyed by a descriptive mark refers to a relatively trivial or insignificant aspect of the product, the particular suggestive mark could be deemed weaker than the descriptive [mark]." *Id.*

The district court did not err by concluding that despite Jackpocket's mark (JACKPOCKET) being suggestive, it is inherently weak. JACKPOCKET incorporates a generic term commonly used in the lottery and gaming industry—"jackpot"—in a rather conspicuous manner; indeed, Jackpocket's advertising focuses more heavily on the "jackpot" component of its mark than on the "pocket" component. *See Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 221 (S.D.N.Y. 2022) ("When an individual first opens Jackpocket's application, the word 'jackpot' first appears before expanding into Jackpocket's mark."). There is a tight logical association between "jackpot" and the reason one plays the lottery—to win the top prize, the jackpot—requiring few mental deductions to arrive at lottery courier services, a mode by which one acquires lottery tickets, from JACKPOCKET. JACKPOCKET, which is barely distinct from "jackpot" in appearance or sound, thus "clearly evokes the claimed virtues of the product it references." *RiseandShine*, 41 F.4th at 122. Moreover, that the term "jackpot" is so frequently used in the lottery and internet gaming industry "further underlines the weakness of the mark." *Id.* At bottom, "[t]rademark law does not offer robust protection to those who demand the exclusive right to use words that describe or suggest a product or its virtues." *Id.* at 123.

Jackpocket's criticisms of the district court's opinion on this score are not persuasive. First, the district court did not err by focusing on "jackpot"—the main component of Jackpocket's mark—because a mark may be broken down into its generic components to measure the composite mark's inherent strength. *See Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 330 (2d Cir.

6

2020) (reasoning that the mark BAYSIDE BREEZE was weaker because the word "Breeze" is used in many third-party marks); *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 744 (2d Cir. 1998) (concluding that the mark STREETWISE was "not particularly distinctive in the marketplace" because "[o]ther map manufacturers have used the word 'street' in their product's names"). In any event, its focus on "jackpot" was not at the expense of the composite mark: "By joining 'jackpot' with 'pocket,' the mark conjures up in an immediate sense the essential part of the product offered by Jackpocket—entryway into the opportunity to win the top prize in a lottery." *Jackpocket*, 645 F. Supp. 3d at 241. Second, contrary to Jackpocket's assertion, the district court *did* measure the strength of JACKPOCKET in relation to lottery courier services instead of the broader lottery and gaming market. *See id.* at 240–41 (reasoning that "JACKPOT does not immediately describe what a [lottery] courier service does" in finding the mark suggestive, but that the mark is nevertheless weak due to the immediacy of association between "jackpot" and the relevant product market—lottery tickets "for sale either physically (through the piece of paper) or virtually (through a lottery courier service)"). And Jackpocket's argument that the district court failed to appreciate that "jackpot" can also be associated with gambling endeavors aside from the lottery lacks merit. In *RiseandShine Corp. v. PepsiCo, Inc.*, this Court acknowledged that the mark RISE for a coffee beverage could be also associated with "tea, bottled beverages, energy drinks, soft drinks, drinkable health supplements, cafes, yogurts, and granolas," 41 F.4th at 123, but nevertheless focused its strength analysis on the connection between RISE and coffee beverages. Here, the set of products with which JACKPOCKET could be associated (gambling-related products) is even more narrow than those with which RISE could be associated (beverages, food, supplements, and many other products).

7

Finally, to the extent Jackpocket contends that the district court erred by either underappreciating the way in which JACKPOCKET transcends "jackpot" by creating a portmanteau with another common word ("pocket"), or by homing in too much on the relevant product as lottery tickets as opposed to lottery courier services, any such error would be harmless because the immediacy between JACKPOCKET and lottery courier services, while weaker than between "jackpot" and lottery tickets, is still strong enough to render the mark weak under trademark law. In *RiseandShine*, we held that the connection between RISE and a coffee beverage was too obvious to accord the suggestive mark strength, *see* 41 F.4th at 122, which is arguably a more attenuated association than in this case, where there is a more immediate association based on auditory and visual cues between JACKPOCKET and lottery courier services than between RISE and a coffee beverage.

**B. Acquired Commercial Strength**

An inherently weak mark may nevertheless acquire strength through "public recognition in the marketplace" or "longevity of use." *RiseandShine*, 41 F.4th at 120, 124; *see Guthrie Healthcare Sys.*, 826 F.3d at 41 n.4. Courts look to six factors to determine whether a mark has acquired commercial strength: "[1] advertising expenditures, [2] consumer studies linking the mark to a source, [3] unsolicited media coverage of the product, [4] sales success, [5] attempts to plagiarize the mark, and [6] the length and exclusivity of the mark's use." *Car-Freshner*, 980 F.3d at 329. Jackpocket does not challenge the court's findings that its consumer study lacked probative value (factor two), it did not establish unsolicited media coverage (factor three), there were no attempts to plagiarize its mark (factor five), and the length and exclusivity of use weighed against acquired strength (factor six), but rather challenges only its findings as to its sales success (factor four) and advertising expenditure (factor one).

The district court did not err by concluding that although Jackpocket had spent substantial sums on advertising and achieved significant sales success, these measures, without more, are insufficient indicia of acquired commercial strength. The district court appropriately accorded Jackpocket's evidence of significant revenue and advertising spend little weight due to its recency. This makes sense because the more recent the commercial success and the advertising spend, the weaker they are as proxies for commercial strength, as there has been comparatively little time to establish brand recognition. While some marks may be able to attain fame over a short period of time, the record did not compel that conclusion here.

The district court also appropriately discounted Jackpocket's evidence of significant advertising expenditures based on an expert report explaining that the predominant type of advertising used—traffic-steering—is "used to direct Internet traffic to a web site or application without relying on or building upon the brand's unique features." *Jackpocket*, 645 F. Supp. 3d at 247. It also appropriately noted that Jackpocket's sales peaks coincided with the peaks of lotteries' prize pots, undermining the notion that increased revenue is due to strong brand recognition rather than the product offering increasing in value.

In sum, the relevant inquiry is not whether the incumbent spent significant sums on marketing or earned significant sales revenue; it is instead whether those "[marketing] efforts were effective in causing the relevant group of consumers to associate [the mark with the product offering]," *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987), or whether the circumstances of that sales success were independently probative of increased brand recognition. Jackpocket's evidence fails to meet those requirements.

## II. Similarity of the Marks

In determining the similarity of the marks, "courts must analyze the mark's overall

9

impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 117 (2d Cir. 2006). It is error to "inappropriately focus[] on the similarity of the marks in a side-by-side comparison instead of when viewed sequentially" if the marks would not appear side by side "in the context of the marketplace." *Id.* But "[u]tilizing a side-by-side comparison can be a useful heuristic means of investigating similarities and differences in respective designs, so long as a court maintains a focus on the ultimate issue of the likelihood of consumer confusion." *Id.* "The fact that the two marks appear similar is not dispositive. Rather, the question is whether such similarity is more likely than not to cause consumer confusion." *Brennan's*, 360 F.3d at 133.

The district court did not err by concluding that Jackpocket and Jackpot.com's marks are not so similar as to be likely to cause consumer confusion. The marks use different fonts and different colors; Jackpocket's uses a combination of uppercase and lowercase letters, while Jackpot.com's includes only one uppercase letter; and Jackpocket's appears in a straight line on a single plane, while Jackpot.com's is arced and appears on two planes. The primary similarity between the marks is the shared word "jackpot," which, for the reasons discussed above, is a feature that undermines rather than strengthens the trademark protection JACKPOCKET merits. Moreover, comparing the marks in the context of their respective websites does not increase their similarity—if anything, it further distinguishes them, as the parties' website designs are completely different.

Jackpocket criticizes the district court for relying too heavily on a side-by-side comparison of the marks because they would not appear next to each other in the marketplace and, relatedly, for failing to compare the marks in all of the contexts in which a consumer could confront them in

10

the marketplace. Neither criticism is persuasive. First, the district court did not *solely* compare the marks side by side—it also compared them in the context of their websites. And while it is true that the district court did not consider every possible presentation of Jackpocket's mark in the marketplace, Jackpocket does not explain why considering the marks in that way would have revealed such a heightened degree of similarity between the marks that the district court would have reached a different result.[2]

## III. Actual Confusion

"When two marks have existed side by side in commerce, the evidence of actual confusion among consumers, or of absence of confusion, can be very helpful in determining whether a likelihood of confusion results from the junior's use of a mark similar to the senior mark." *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 102 (2d Cir. 2001). "[T]he relevant confusion is that which affects the purchasing and selling of the goods or services in question." *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir. 1991); *see also id.* ("[T]rademark infringement protects only against mistaken purchasing decisions and not against confusion generally."). Accordingly, evidence of actual confusion must "link[] the confusion . . . to any potential or actual effect on *consumers*' purchasing decisions." *Id.* (emphasis added).

The district court did not err in concluding that Jackpocket failed to establish actual confusion. Jackpocket does not challenge the district court's decision to discount its consumer survey, which is often the most powerful evidence of actual confusion, *see Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 387–88 (2d Cir. 2005), due to methodological flaws. Without a

---

[2] Jackpocket does argue that it advertises over the radio and that the two marks bear a striking auditory similarity. But, as mentioned above, this similarity is based on the common word "jackpot," which does not entitle JACKPOCKET to greater trademark protection.

consumer survey, all that remains is a handful of anecdotes of journalists, potential investors, customers, and other non-customers mixing up Jackpocket and Jackpot.com in various contexts, including several inquiries directed to Jackpocket's support department from Jackpot.com customers. Jackpocket argues that the district court erred in excluding anecdotes that occurred before Jackpot.com announced plans to enter the U.S. market, contending that such evidence may be especially probative precisely *because* Jackpot.com had not entered the U.S. market yet, meaning that confusion would likely only worsen if its mark was actually in commerce. But even if the district court so erred, this evidence is *de minimis*, and the district court did not clearly err by finding such evidence insufficient to establish actual confusion. *See Star Indus.*, 412 F.3d at 387–88 (finding evidence that "consisted entirely of testimony by several interested witnesses recounting a handful of anecdotes, including a number of hearsay statements by unidentified and unidentifiable declarants," insufficient to establish consumer confusion where plaintiff "fail[ed] to present its own consumer survey"). And, again, the confusion may have well been a result of the shared word "jackpot," which does not weigh in Jackpocket's favor.

In any event, even if the district court erred and should have concluded that the actual consumer factor weakly favors Jackpocket, given that all of the other factors but one are either neutral or favor Jackpot.com, this determination would not have altered the ultimate balancing of the *Polaroid* factors.

\* \* \*

Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk

12